Receipt Number

$\underline{540467}$

144

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ACS CONSULTANT COMPANY, INC. f/k/a SUPERIOR CONSULTANT COMPANY, INC., a Michigan Corporation,

Plaintiff,

v.

WILLIE WILLIAMS, RYLAND HAMLET, and RAUL MESTRIL, Individuals, and HEALTHCARE INFORMATICS TECHNICAL STAFFING, LLC, a California Limited Liability Company,

Defendants.

Exhibits A-T

Case: 2:06-cv-11301
Assigned To: Zatkoff, Lawrence P
Referral Judge: Capel, Wallace
Filed: 03-29-2006 At 12:15 PM
CMP ACS CONSULTANT CO V. WILLIAMS, ET AL (TAM)

---

**Carey A. DeWitt (P36718)**
**Elizabeth A. DuMouchelle (P45462)**
**Gregory N. Blase (P66079)**
BUTZEL LONG
Suite 100, 150 West Jefferson
Detroit, Michigan 48226-4450
(313) 225-7000
**Attorneys for Plaintiff**

---

### VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, ACS Consultant Company, Inc., f/k/a Superior Consultant Company, Inc. ("Superior," "ACS" or "Company"), by its attorneys, **BUTZEL LONG**, states as follows:

### INTRODUCTION

1.      This action arises out of various torts and breaches of contract, and violations of the Michigan Uniform Trade Secrets Act.

## JURISDICTION AND PARTIES

2. The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

3. Jurisdiction exists in this Court pursuant to Title 28, United States Code §1332.

4. Plaintiff ACS is a Michigan corporation doing business in the State of Michigan, with its principal place of business at 5225 Auto Club Drive, Dearborn, Michigan 48126.

5. Defendant, Willie Williams ("Williams"), is a citizen of the State of California, residing at 404 E. First St. #140, Long Beach, California 90802.

6. Defendant, Ryland Hamlet ("Hamlet"), is a citizen of the State of California, residing at 2824 Nora Lane, Modesto, California 95355.

7. Defendant, Raul Mestril ("Mestril"), is a citizen of the State of Florida, residing at 1425A SW 107 Avenue, Miami, Florida 33174.

8. Defendant HCI Technical Staffing LLC ("HCI") is a California Limited Liability Company with its principal place of business at 355 Gellert Blvd #230, Daly City, California 91737. Its registered agent is Scot Oster and registered agent address is 41 Peninsula Center 7000-31, Rolling Hills Estates, California 90274.

## GENERAL ALLEGATIONS

9. ACS is an information technology and management consulting company, providing information technology and business process outsourcing services, and information technology and management consulting services, integrated solutions, application software implementation, and enterprise application integration, principally to companies in healthcare industries, including healthcare providers such as hospitals and integrated healthcare delivery

systems, and vendors of software and information systems. **(See Exhibit A, portions of ACS' website.)**

10. ACS was incorporated in 1984 and has continuously been in existence since that time. **(Exhibit B)** From October 1996 to the present time ACS has been a wholly owned subsidiary of ACS Consultant Holdings Corporation, a Delaware Corporation ("Holdings"). Effective January 27, 2005, Holdings became a wholly owned subsidiary of Affiliated Computer Services, Inc., a publicly traded (NYSE: ACS) Fortune 500 corporation. Following the acquisition, Superior remains a wholly owned subsidiary of Holdings, which is now a wholly owned subsidiary of Affiliated Computer Services, Inc. Following the acquisition by Affiliated Computer Services, Inc., Holdings, the Delaware corporation, was renamed "ACS Consultant Holdings Corporation"; and Superior Consultant Company, Inc., the Michigan corporation, was renamed "ACS Consultant Company, Inc." In connection with the name change, the Michigan Corporation also registered an assumed name, "Superior Consultant Company." The corporate entity Superior, the Michigan corporation founded in 1984 has continued its existence without interruption since that time. Superior/ACS was Hamlet's employer, without interruption, from the commencement of his employment in November 2004 until his termination on March 8, 2006. Throughout the entire term of his employment, November 2004 through March 8, 2006, Hamlet's Employment Agreement was always with Superior, see **Exhibit F**, and his paychecks were at all times issued by Superior/ACS. The acquisition of Holdings by Affiliated Computer Services, Inc. in January 2005 occasioned no change in the employment relationship between Hamlet and Superior.

11. ACS hired Defendant Williams effective July 5, 2005, as an Executive Director. On his employment application, Williams listed Defendant Mestril as a reference.

(**Exhibit C**) He was assigned to a large scale implementation of Epic Systems Corporation's ("EPIC") software and other various projects at Kaiser-Permanente ("Kaiser") in Southern California ("the Kaiser Project"). Kaiser is one of the largest American healthcare systems (**Exhibit D**) and an extremely important client of ACS. The Kaiser Project is a critical and complex EPIC implementation project requiring onsite assignment there of numerous highly talented and specialized ACS employees. Williams' title at the Kaiser Project was Engagement Manager – the top ACS onsite executive manager at the Kaiser Project. His job responsibilities included the oversight of more than 160 ACS employees working at the site of the Kaiser Project. All ACS managers at the Kaiser Project reported to Williams. While employed at ACS, Williams received training in the ACS ethics policy.

12.    Because of Williams' position at ACS, by virtue of which he would be exposed to the sensitive, proprietary, and trade secret information of ACS, particularly the ACS employee skills bank and client databases in connection with his top executive position at the Kaiser Project, the employment agreement that the Company had Williams sign on June 22, 2005 ("Williams EA") contained certain provisions designed to protect the Company's interests in its confidential information. Dan Sak, Director of Human Resources for ACS, signed the Williams EA on behalf of ACS on June 15, 2005. (**Exhibit E**)

13.    ACS hired Defendant Hamlet effective November 15, 2004 as a Senior Management Consultant. Hamlet was assigned to the Kaiser Project as a Field Manager and was to work closely with the Engagement Manager – Williams. His job duties included management of all ACS employees and subcontractors on site, including their training, certification, expenses, time management, and process flows. Hamlet received training in EPIC software and the ACS ethics policy.

14.     Because of Hamlet's management position, by virtue of which he would be exposed to the sensitive, proprietary, and trade secret information of ACS, the employment agreement that the Company had Hamlet sign on November 11, 2004 ("Hamlet EA") contained certain provisions designed to protect the Company's interests in its confidential information. Dan Sak, Director, HR, signed the Hamlet EA on behalf of ACS on November 4, 2004. **(Exhibit F)**.

15.     ACS hired Defendant Mestril effective October 3, 2005 as a Manager. On his new hire checklist, Williams was noted as the ACS employee referral. **(Exhibit G)** Mestril was assigned to the Kaiser Project as a Recruiting Manager. His job duties included management of all recruiting activities at the Kaiser Project, including EPIC certification. He was required to create and manage all process flows related to recruiting. Hamlet reported directly to Williams and worked closely with Hamlet.

16.     Because of Mestril's management position, by virtue of which he would be exposed to the sensitive, proprietary, and trade secret information of ACS, the employment agreement that the Company had Mestril sign on September 28, 2005 ("Hamlet EA") contained certain provisions designed to protect the Company's interests in its confidential information. Susan M. Synor, Senior Vice President, signed the Mestril EA on behalf of ACS on September 27, 2005. **(Exhibit H)**.

17.     Williams, Hamlet and Mestril traveled to Michigan during their employment with ACS. In their management capacities, Williams, Hamlet and Mestril maintained regular contact with ACS' Michigan headquarters and offices. They traveled to Michigan in the performance of their duties for ACS, e.g., attending quarterly meetings.

18.     Williams, Hamlet, and Mestril each agreed, among other things, to the

following terms in each of the Williams EA, the Hamlet EA, and the Mestril EA (collectively

"Agreements"):

18.     Choice of Law and Forum:  This Employment Agreement will be governed by and interpreted in accordance with the laws of the State of Michigan.

Any action arising out of this Agreement or the termination of this Agreement, or the performance of services under this agreement, or the relationship between the parties established herein, shall be brought only in the Oakland County Circuit Court, Michigan, or United States District Court for the Eastern District of Michigan, Southern Division at Detroit, Michigan, and Employee hereby consents to and submits to the jurisdiction of either of such courts for such purpose.

7.      Company Resources:  The Employee recognizes that all company resources of any kind and nature including but not limited to personnel; equipment and telephones; software; written materials, methods and procedures; client and prospect names, files and documentation are the sole property of the Company and shall not be used for personal or any other non-company use.

8.      Other Gainful Employment: The Employee shall devote full employment energies, abilities and time to the performance of services hereunder.  The Employee is prohibited from performing services similar to those offered by [the Company] on behalf of any other company, organization, individual or legal entity.  Further, the Employee must seek written approval of the Company prior to engaging in any employment of any nature, similar to the Company's services or otherwise.

9.      Non-competition:

(a) No Recruitment of Company Personnel:  In consideration of employment with the Company, the employee is prohibited, during employment and for a period of two (2) years following termination of employment for any reason, from recruiting, on behalf of him or herself, or on behalf of any third party, any employees of the company either directly or indirectly, specifically including, without limitation, identification to a third party (including, without limitation, recruiting agencies, employers and prospective employers) employees of the Company or any of its subsidiaries or affiliates.

(b) Restrictions on Solicitation of Company Clients:  In consideration of employment with the Company, the employee is prohibited, during employment and for a period of six (6) months following termination of employment for any reason, from (1) soliciting business and/or performing services via direct employment or through a party other than the Company,

its subsidiaries or affiliates, for clients of the Company or prospective clients of the Company for whom the employee, during the twelve (12) month period immediately preceding termination of employment, was directly involved in the delivery of products or performance of services, or was personally involved in a relationship management role or in sales or marketing efforts; (2) soliciting, individually or on behalf of any person or entity, to perform, or performing services for, or referring to or advising any person or entity about, an opportunity to perform services for any client or prospective client of ACS where employee learned of the opportunity for that work while employee was employed by ACS.

(c) <u>No Competitive Business Involvement</u>:  In consideration of employment with the Company, the employee is prohibited, during employment and for a period of six (6) months following termination of employment from engaging in healthcare information systems consulting, management consulting or other businesses competitive with the Company.[1]

(d) <u>Survival</u>: The non-competition provisions contained herein shall survive termination of employment.

10.     <u>Proprietary Rights</u>:  The employee agrees that all work and creation of work products associated with this Employment Agreement are deemed work for hire for the company.  In consideration of employment with ACS the employee assigns and transfers to ACS all property rights of any kind and nature (including without limitation royalties, other income and property rights) in discoveries, inventions, patentable material, copyrightable materials (including any writing, book, article, computer program, work method, film, recording or graphic production) and other work products.  The employee further agrees the employee shall cause to be furnished to the company such instruments, instructions, and documentation as the company may reasonably require to insure that the aforesaid rights shall belong to the company.  The employee shall, upon request by ACS, return or destroy all proprietary information as so directed by the company.

11.     <u>Confidential Information</u>:  The employee recognizes that in the course of performance of work for the Company the employee will obtain access to materials and information of [the Company], its subsidiaries and affiliates that constitute trade secrets and proprietary information of the company, its subsidiaries and affiliates including, without limitation, descriptions of [the Company's], its subsidiaries' and affiliates' products and services, planned products and services, business and marketing/sales plans, mergers and acquisition targets, employee compensation plans, employee medical information, the identities of suppliers, customers and prospective customers, identities of employees and prospective employees, prices and pricing policies in whatever form received by employee, including without limitation, written,

---

[1] Paragraph 9(c) does not appear in the Hamlet EA.

voice, electronic or magnetic media or graphic display. The employee shall not utilize any such information for any purpose other than the performance of this Employment Agreement and shall not disclose any such information to any third party. The employee shall, upon request by [the Company], return or destroy, as directed by [the Company], any media in which such information is recorded.

The employee shall also observe any restrictions with respect to the use and disclosure of the confidential information of [the Company's] clients that are specified in [the Company's] service agreements with the clients, or that are reasonably required by the clients.

The employee understands that his/her obligation of non-disclosure shall survive termination of employment for any reason whatsoever.

14.    Termination of Employment: In the event employment with the company is terminated by either the employee or the company, the employee agrees to return all materials acquired during the term of employment with the company. Specifically, this is to include without limitation, computer disks, computers, work papers, manuals, training manuals, notes, articles, phone lists, correspondence, proposals, addresses, reports, phone cards, office keys and any and all material related to employment with the company.

19.    ACS' business is national (and international) in scope. ACS has employees residing in at least forty-eight (48) states, and has worked for clients in all fifty (50) states and in countries around the world. Again, in their management and recruiting capacity, Defendants were directly involved with the Company's business on a multi-state level.

20.    In their management capacity, Defendants were intimately familiar with ACS' (1) proprietary, sensitive, and confidential systems, components, information and materials, (2) most critical and competitively sensitive business relationships and information, including the data in ACS' secure employee skills database and (3) most carefully guarded strategies and initiatives. Such information included, but was not limited to, reports on application delivery, sales reports for the company, revenue forecasts, requests for proposal, requests for bid, client correspondence, notes of site visits, marketing data, prospect meeting data, proposals, contracts awarded, vendor recommendations, employee skills database

("Novient"), employee contact information, agency and subcontractor relationships, competitive bid information, client contact lists, customer information, internal strengths and weaknesses, business plans, strategic planning, project costs, profit, margin, and forecasting information, employee and prospective employee data, practice strategies, confidential customer information, as well as a range of technical information concerning both ACS and its customers (including staffing, systems, hardware and software applications). (See, e.g. **Exhibit I)**

21. On the occasions during the period Defendants were employed with ACS they attended quarterly meetings in Michigan and became privy to ACS' proprietary training courses and very sensitive information that they could use as management employees of ACS. During the period of their employment, Defendants maintained contact with ACS' Michigan office in performing their job functions.

22. ACS uses subcontractors to staff some of its consulting engagements. On or about November 7, 2005, ACS entered into a Subcontractor Master Agreement ("ACS/HCI Contract") with HCI **(Exhibit J)**. HCI is a technical staffing company. **(Exhibit K, HCI website)** The ACS/HCI Contract was executed on behalf of HCI by Noelle Dayola as an officer of HCI. ("Dayola") Dayola is the wife of Hamlet. Neither Dayola nor Hamlet disclosed their marital relationship to ACS. Hamlet is a principal of HCI. **(Exhibit L)**

23. Under the ACS/HCI Contract, HCI would provide subcontracting services based on ACS work orders. ACS never issued any work orders to HCI. HCI held itself out as a preferred vendor to ACS. **(Exhibit M)**

24. In addition to staffing consultant engagements, HCI acts as a recruiting agency that recruits, evaluates and presents candidates to healthcare facilities and to healthcare consultants such as ACS.

25.     ACS has a large internal recruiting department, through which ACS finds and hires employees for positions throughout the Company and for assignment to the Company's clients' projects.  ACS has an incentive plan through which ACS encourages its employees to recommend potential candidates for hire.  If a recommended candidate is hired by ACS, the referring employee is eligible for a bonus ("referral bonus").

26.     As an outside recruiting agency, HCI presented candidates with EPIC experience to Hamlet, Mestril and Williams at Kaiser.  As a result, ACS hired several HCI candidates to work at the Kaiser Project implementing the EPIC software.

27.     In December 2005, Hamlet approached an ACS employee assigned to the Kaiser Project, and asked her to help recruit two to three ACS employees with EPIC experience for a new opportunity at Sutter Health.  Sutter Health is a large healthcare system like Kaiser and has facilities all over California. **(Exhibit N)**  Hamlet had worked at Sutter Health - Memorial Medical Center in Modesto, California ("MMC"), and used MMC Chief Information Officer Jennifer Sierras as a reference on his employment application. **(Exhibit O)**  Sutter Health is a very important client of ACS where ACS has provided consulting services to Sutter Health.

28.     The ACS employee ("First ACS Employee"), thinking that Hamlet meant the placement of ACS employees at Sutter Health as part of an ACS engagement there, gave Hamlet the names and profiles of a number of ACS employees.  Also, mindful of ACS' ongoing need for EPIC qualified consultants (and presumably hoping for an ACS referral bonus), First ACS Employee gave to Hamlet several resumes of potential employment candidates with EPIC experience. ACS employees at the Kaiser Project were instructed to handle all recruiting matters through Mestril, Hamlet and Williams only.   In addition, a

second ACS employee ("Second ACS Employee") at the Kaiser Project gave Hamlet resumes of potential EPIC candidates for what Second ACS Employee thought were ACS projects.

29.     The names of the persons whose resumes were given by First ACS Employee and Second ACS Employee to Hamlet were never delivered by him to the ACS internal recruiting and hiring process. One of the persons referred to Hamlet by First ACS Employee was later hired by Williams through HCI to work at the Kaiser Project. The individual's ACS hiring request listed him as an HCI candidate with an associated HCI placement fee, even though, on information and belief, the referral of the name to HCI came from inside ACS.

30.     Later in January 2006, Hamlet told First ACS Employee that the EPIC experienced people he was looking for to place at Sutter Health were to be placed there through a third party identified by Hamlet as "the Agency," and not as ACS employees. Hamlet told First ACS Employee that First ACS Employee would have to resign from ACS for the new opportunity at Sutter Health. In addition, Hamlet told First ACS Employee that Williams was on the board of "the Agency" and that First ACS Employee would receive payments from the hourly wages of each person First ACS Employee recommended to "the Agency." Hamlet further told First ACS Employee that Willie Williams and Hamlet would each also receive payments from the Agency based upon billable hours by candidates referred by First ACS Employee. What Hamlet presented to First ACS Employee was, in effect, a pyramid or "Ponzi" scheme. Hamlet also told First ACS Employee that they all would make money but First ACS Employee would have to contribute $10,000.00 of First ACS Employee's own money as a start.

31.     On January 31, 2006, First ACS Employee contacted Susan Synor, Senior Vice President at ACS, and expressed First ACS Employee's concerns about Hamlet, Williams and the placement of people through "the Agency."

11

32.     ACS mounted an investigation and discovered that Williams, Hamlet and Mestril had breached their Agreements and misappropriated proprietary information and trade secrets of ACS.  On March 7, 2006, Susan Synor received a telephone call from a third ACS employee assigned to work at the Kaiser project ("Third ACS Employee").   Third ACS Employee told Synor that on March 6, 2005, Third ACS Employee was approached by Williams, who said that he would be leaving ACS soon and was looking to take seven to ten top people with him to an account "up north that is really big."  Williams said that he wanted Third ACS Employee on his team and wanted to meet with Third ACS Employee the next day to talk more about the account "up north."  Third ACS Employee was able to confirm through a subcontractor working for ACS at the Kaiser Project that "up north" meant Sutter Health and that Williams, Hamlet and Mestril were all going there. Third ACS Employee then stated to Synor that the morale among the ACS employees assigned was poor because people did not trust Williams.

33.     On March 8, 2006, ACS executives met with Williams and terminated his employment based on their investigation. Williams stated that he would bring a racial discrimination claim in connection with his termination. ACS confiscated Williams' Company-issued laptop.   Later, a demand was made upon Williams for the return of all Company materials, including the Company Blackberry. **(Exhibit S)**  Other than the laptop that was confiscated, Williams has never returned any materials, including the Blackberry. Next, ACS Executives met with Mestril and terminated Mestril's employment, based also on information obtained during the investigation.  When ACS demanded return of the Company laptop computer, Mestril told them that the laptop was at his apartment, and that he would return it if ACS would come to his apartment.  When ACS personnel walked with Mestril to

his apartment, Mestril professed surprise that the laptop was not on the chair where he claimed he had left it, and he claimed he did not know where his laptop was located.

34. When the ACS executives tried to meet with Hamlet to terminate his employment, they discovered that Hamlet had left the building. Hamlet was seen leaving the building with Williams. On March 8, 2006, ACS sent a letter to Hamlet by Federal Express Carrier, notifying him of his termination, and demanding return of all Company materials, including the Company laptop computer (**Exhibit P**). On March 10, 2006, Hamlet sent an e-mail to Jean Irwin, ACS Human Resources Manager, stating that he had left sick on March 8, 2006, and that he could not access his e-mail at ACS. Irwin re-sent the notification letter. (**Exhibit Q**) In a return e-mail, Hamlet made reference to "harassment" and racial discrimination issues. (**Exhibit R**). Mestril and Hamlet have never returned their Company-issued laptops or any other Company materials in their possession. On information and belief, all Defendants possess additional ACS property and proprietary information.

35. In its investigation of Williams, Hamlet and Mestril, ACS uncovered a conspiracy among Williams, Hamlet and Mestril to appropriate potential candidates from ACS and to present them as HCI candidates to The Kaiser Project and other sites. ACS also discovered that Williams, Hamlet and Mestril planned to leave ACS, to compete directly with ACS, and to take with them several ACS employees from the Kaiser Project.

36. As former employees in competition with ACS, Williams, Hamlet and Mestril, working in concert with HCI, will necessarily be called upon to use the trade secrets and confidential information that ACS entrusted to them. Such use and disclosure is inevitable.

37. Williams, Hamlet and Mestril had a fiduciary relationship, and assumed a relationship of trust and confidence, with ACS. This relationship was one of principal (ACS)

and agents (Williams, Hamlet and Mestril), as well as employer and employees, in which Williams, Hamlet and Mestril were obligated to act only in the interest of ACS.

38.     Since Williams, Hamlet and Mestril worked in a management capacity, ACS equipped and entrusted them with the resources necessary to perform their integral functions, including financial, administrative, operational support, and client delivery, particularly in recruiting and staffing, access to and use of ACS' most valuable and proprietary information and trade secrets, and direct contact with important ACS customers.

39.     ACS took reasonable security measures to protect its proprietary and confidential information.    The company specifically required its employees to sign a confidentiality agreement as part of their Agreements.  Employees' access to ACS sensitive and proprietary information is password protected.  Certain information is distributed on a "need to know" basis only.  The physical premises of ACS are secured with physical access further restricted as well.

40.     Following established protocol to protect proprietary and confidential information, on March 10, 2006, ACS sent a letter to Williams (**Exhibit S**), and to Mestril (**Exhibit T**) with a "formal directive" that each "return all materials acquired or compiled during the term of your employment with [the Company] . . . to include without limitation, computers, computer disks, office equipment, telephone equipment, work papers, notes, articles, phone lists, employee and prospective employee and recruit candidate lists and files, correspondence, proposals, addresses, reports, manuals, handbooks, phone cards, office keys and any and all material related to employment with [the Company]."  The letter to Williams also demanded the return of his Blackberry. In addition, the letter to each notified each that "any attempts to delete material "wipe clean" or otherwise damage the hard drive is

destruction of company property." (**Exhibits S and T**). The March 8, 2006 letter to Hamlet contained the same language. (**Exhibit Q**)

41.    Williams, Hamlet and Mestril expressly agreed that "all company resources of any kind and nature including but not limited to personnel; equipment and telephones; software; written materials, methods and procedures; client and prospect names, files and documentation are the sole property of the Company and shall not be used for personal or any other non-company reasons." (**Exhibits E, F and H, ¶ 7**)

42.    Williams, Hamlet and Mestril expressly agreed that they were "prohibited from performing services similar to those offered by [the Company] on behalf of any other company, organization, individual or other legal entity." They also agreed that they were "prohibited from soliciting or negotiating to perform services similar to those offered by [the Company] on behalf of any other company, organization, individual or legal entity" and must "seek written approval of the Company prior to engaging in any employment of any nature, similar to the Company's services or otherwise." (**Exhibits E, F and H, ¶ 8**)

43.    Williams, Hamlet and Mestril expressly agreed that they were "prohibited, during employment and for a period of two (2) years following termination from employment for any reason, from recruiting, on behalf of him or herself, or on behalf of any third party, any Employees of the Company either directly or indirectly, specifically including, without limitation, identification to a third party (including, without limitation, recruiting agencies, employers and prospective employers) employees of the Company or any of its subsidiaries or affiliates." (**Exhibits E, F and H, ¶ 9(a)**)

44. Williams, Hamlet and Mestril expressly agreed that they were "prohibited , during employment and for a period of six (6) months following termination of employment for any reason, from (1) soliciting business and/or performing services via direct employment or through a party other than the Company, its subsidiaries or affiliates, for clients of the Company or prospective clients of the Company for whom the employee, during the twelve (12) month period immediately preceding termination of employment, was directly involved in the delivery of products or performance of services, or was personally involved in a relationship management role or in sales or marketing efforts; (2) soliciting, individually or on behalf of any person or entity, to perform, or performing services for, or referring to or advising any person or entity about, an opportunity to perform services for any client or prospective client of [the Company] where employee learned of the opportunity for that work while employee was employed by [the Company]." **(Exhibits E, F and H, ¶ 9(b))**

45. Williams and Mestril further agreed that they were "prohibited, during employment and for a period of six (6) months following termination of employment from engaging in healthcare information systems consulting, management of consulting or other businesses competitive with the Company." **(Exhibits E, F and H, ¶ 9(b)(c))**

46. Williams, Hamlet and Mestril have breached their Agreements with ACS by virtue of the violations set forth in this Verified Complaint.

47. Based upon their conduct to date, it is clear that Williams, Hamlet and Mestril will continue to violate the confidentiality, non-competition, other gainful employment, and other provisions of the Agreements.

48. ACS has been and will continue to be severely damaged by the actions of Williams, Hamlet and Mestril in violation of their contractual and other obligations as set forth in this Verified Complaint.

49.     ACS has no adequate remedy at law for Defendants' actions because the damages ACS has suffered, and will continue to suffer, in connection with the misuse and wrongful disclosure of confidential information and trade secrets, competitive edge, as well as the loss of its employees and prospective employees, its customer goodwill, and fair competition are incapable of exact proof. Among other things, these damages and losses have caused and will continue to cause ACS irreparable harm.

50.     Williams, Hamlet and Mestril will, unless restrained preliminarily and permanently, continue to violate ACS' rights, and will continue to ignore their contractual and other duties to ACS by continuing their work, with a competing entity, namely, HCI, and continuing to attempt to misappropriate and wrongfully use ACS' confidential and proprietary information and trade secrets.

51.     Accordingly, a preliminary and permanent injunction restraining and enjoining Williams, Hamlet and Mestril from continuing these actions is the only remedy that will afford ACS meaningful relief.

52.     Due to the violations by Williams, Hamlet and Mestril of the six-month non-competition, non-solicitation and non-disclosure restrictions in the Agreements, the permanent injunction must be extended for a period of time equaling the period of non-compliance of Williams, Hamlet and Mestril.

53.     On information and belief, Hamlet currently is working for Sutter Health.

54.     Due to the misuse and wrongful disclosure of confidential and proprietary information and trade secrets, as well as loss of its competitive edge, customer goodwill, and fair competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

## COUNT I

### BREACH OF CONTRACT-NON-COMPETITION
### NO COMPETITIVE BUSINESS INVOLVEMENT PROVISION
### DEFENDANTS WILLIAMS AND MESTRIL

55.     ACS realleges each and every allegation contained in paragraphs 1 through 54, inclusive, of this Complaint as though completely set forth herein.

56.     As Executive Director and Engagement Manager of the Kaiser Project, Williams freely entered into the enforceable Williams EA with ACS, in exchange for which he received a lucrative compensation package and access to ACS' most valuable information and customers.

57.     As Manager and Recruiting Manager of the Kaiser Project, Mestril freely entered into the enforceable Mestril EA with ACS, in exchange for which he received a lucrative compensation package and access to ACS' most valuable information and customers.

58.     The Agreements provide that "the employee is prohibited, during employment and for a period of six (6) months following termination of employment from engaging in healthcare information systems consulting, management of consulting or other businesses competitive with the Company." **(Exhibits E and H, ¶ 9(c))**.

59.     On information and belief, during the period they were employed with ACS from December 2005 through the date of their terminations, Williams and Mestril conspired with Hamlet HCI to siphon recruiting information and potential candidates from ACS by soliciting and accepting resumes from First ACS Employee and from Second ACS Employee, disclosing the resumes to HCI, evaluating the resumes and representing the candidates to ACS at the Kaiser Project or to Sutter Health on behalf of HCI. On behalf of HCI, Williams, Hamlet and Mestril communicated with recruiting candidates for placement at the Kaiser

Project, to Sutter Health, or to others so that HCI would receive the recruiting and placement fee. This cost ACS money and deprived ACS employees, such as First ACS Employee and Second ACS Employee, of the opportunity to earn referral bonuses.

60.    As a proximate result of the violation by Williams and Mestril of their contractual obligations, ACS has been and will continue to be irreparably damaged and injured.

61.    ACS has no adequate remedy at law for the actions of Williams, Hamlet and Mestril because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, the loss of its employees and prospective employees, customer goodwill, and fair competition are severe and are incapable of exact proof.

62.    Williams and Mestril will, unless restrained preliminarily and permanently, continue to violate ACS' rights and to ignore their contractual duties.

63.    Accordingly, a preliminary and permanent injunction restraining and enjoining Williams, Hamlet and Mestril from continuing their unlawful actions is the only remedy that will afford ACS meaningful relief.

64.    Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and fair competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.

## COUNT II

### BREACH OF CONTRACT - CONFIDENTIALITY
### PROVISION - DEFENDANTS WILLIAMS, HAMLET AND MESTRIL

65.    ACS realleges each and every allegation contained in Paragraphs 1 through 64, inclusive, of this Complaint as though completely set forth herein.

66.    Because Williams, Hamlet and Mestril entered into their respective Agreements, they agreed that "in the course of performance of work for the Company [they] will obtain access to materials and information of the company, its subsidiaries and affiliates that constitute trade secrets and proprietary information of ACS, its subsidiaries and affiliates." **(Exhibits E, F and H, ¶ 11)**

67.    The Agreement specifically defines trade secrets and proprietary information to include, "without limitation, descriptions of the company's, its subsidiaries' and affiliates' products and services, planned products and services, business and marketing/sales plans, mergers and acquisition targets, employee compensation plans, employee medical information, the identities of suppliers, customers and prospective customers, identities of employees and prospective employees, prices and pricing policies in whatever form received by employee, including without limitation, written, voice, electronic or magnetic media or graphic display." **(Exhibits E, F and H, ¶ 11)**

68.    Because Williams, Hamlet and Mestril entered into their respective Agreements with ACS, they were contractually obligated not to utilize and/or disclose any trade secrets and/or proprietary information of ACS.  **(Exhibits E, F and H, ¶ 11)**

69.    In unlawfully competing with ACS, Williams, Hamlet and Mestril have breached, and will inevitably continue to breach their respective Agreements with ACS by utilizing and/or disclosing ACS' trade secrets and/or proprietary information.

70.    ACS has been and, unless Williams, Hamlet and Mestril are enjoined, will continue to be irreparably damaged by the use and disclosure, and/or inevitable use and disclosure, by Williams, Hamlet and Mestril, of ACS' confidential information and trade secrets.

71.    ACS has no adequate remedy at law for the actions of Williams, Hamlet and Mestril because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, the loss of its employees and prospective employees, as well as its loss of competitive edge, are severe and incapable of exact proof.

72.    Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and unfair competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

## COUNT III

### BREACH OF CONTRACT – OTHER GAINFUL EMPLOYMENT PROVISION -DEFENDANTS WILLIAMS, HAMLET AND MESTRIL

73.    ACS realleges each and every allegation contained in Paragraphs 1 through 72, inclusive, of this Complaint as though completely set forth herein.

74.    Williams, Hamlet and Mestril were required to "devote full employment energies, abilities and time to the performance of services hereunder." Williams, Hamlet and Mestril were prohibited from "performing services similar to those offered by ACS on behalf of any other company, organization, individual or other legal entity" and from "soliciting or negotiating to perform services similar to those offered by [the Company] on behalf of any

other company, organization, individual or legal entity" without "written approval of the Company." **(Exhibits E, F and H, ¶ 8)**

75.     Through their unlawful conduct, as set forth in this Verified Complaint, Williams, Hamlet and Mestril have breached the Other Gainful Employment provision of their respective Agreements. Specifically, Williamsand Mestril, working on behalf of HCI, accessed the proprietary information and trade secrets of ACS and misappropriated recruiting candidates from ACS, presented those candidates to Williams for placement at the Kaiser Project with the intent of obtaining fees from ACS for HCI as an outside recruiting agency. On information and belief, HCI, with the assistance of Williams, Hamlet and Mestril, also presented misappropriated ACS candidates to Sutter Health.  Williams, Hamlet and Mestril, on information and belief, presented themselves to Sutter Health as available HCI consultants with the ability to oversee an EPIC or other software implementation at Sutter Health and staff such a project.

76.     ACS has been and, unless Williams, Hamlet and Mestril are enjoined, will continue to be irreparably damaged by the use and disclosure, and/or inevitable use and disclosure, by Williams, Hamlet and Mestril, of ACS' confidential information and trade secrets.

77.     ACS has no adequate remedy at law for the actions of Williams, Hamlet and Mestril because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, the loss of its employees and prospective employees, as well as its loss of competitive edge, are severe and incapable of exact proof.

78.     Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and unfair

competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

**COUNT IV**

**BREACH OF CONTRACT – NON-COMPETITION – NO RECRUITMENT**
**OF COMPANY PERSONNEL PROVISION – DEFENDANTS**
**WILLIAMS , HAMLET AND MESTRIL**

79.     ACS realleges each and every allegation contained in Paragraphs 1 through 78, inclusive, of this Complaint as though completely set forth herein.

80.     Williams, Hamlet and Mestril, by signing their respective Agreements, agreed that they were "prohibited, during employment, and for a period of two (2) years following termination of employment for any reason, from recruiting, on behalf of [themselves], or on behalf of any third party, any Employees of the Company either directly or indirectly, specifically including, without limitation, identification to a third party (including without limitation, recruiting agencies, employers and prospective employers) employees of the Company or any of its subsidiaries or affiliates." **(Exhibits E, F and H, ¶ 9(a))**

81.     Through their unlawful conduct, as set forth in this Verified Complaint, Williams, Hamlet and Mestril have breached the No Recruitment of Company Personnel provision of their respective Agreements.     Specifically, Hamlet, in December 2005, approached First ACS Employee and asked First ACS Employee to help recruit two to three EPIC experienced ACS employees for a new opportunity at Sutter Health to implement EPIC software. Hamlet also told First ACS Employee the EPIC experienced people he was looking for to place at Sutter Health were to be placed there through "the Agency," not as ACS employees.     Hamlet told First ACS Employee that Williams was on the board of "the Agency" and that First ACS Employee would receive a payment (as would Williams and

23

Hamlet) from the hourly wages of each person First ACS Employee recommended to "the Agency." Hamlet told First ACS Employee that they "all would make money" but First ACS Employee would have to contribute $10,000.00 of First ACS Employee's own money as a start. Williams approached Third ACS Employee on March 6, 2005, and told Third ACS Employee that he would be leaving ACS soon and was looking to "take seven to ten top people with him" to an account "up north that is really big." Williams said that he wanted Third ACS Employee on his team and wanted to meet with Third ACS Employee the next day to talk more about the account "up north." Third ACS Employee was able to confirm through a subcontractor for ACS working at the Kaiser Project that "up north" meant Sutter Health and that Williams, Hamlet and Mestril were all going there.

82. Williams, Hamlet and Mestril have attempted and on information and belief continue in their attempts to raid the Kaiser Project of the highly talented ACS employees with EPIC capabilities in order to take those employees with them and directly compete with ACS. Unless Williams, Hamlet and Mestril are enjoined, ACS has been and will continue to be irreparably damaged by the use and disclosure, and/or inevitable use and disclosure, by Williams, Hamlet and Mestril of ACS' confidential information and trade secrets to purloin ACS employees from the Kaiser Project for their and HCI's gain.

83. ACS has no adequate remedy at law for the actions of Williams, Hamlet and Mestril because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, the loss of its employees and prospective employees, as well as its loss of competitive edge, are severe and incapable of exact proof.

84. Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and unfair

competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

## COUNT V

### BREACH OF FIDUCIARY DUTY
### DEFENDANTS WILLIAMS, HAMLET AND MESTRIL

85. ACS realleges each and every allegation contained in paragraphs 1 through 84, inclusive, of this Complaint as though completely set forth herein.

86. Williams, Hamlet and Mestril have fiduciary duties to ACS.

87. In their management capacities at ACS, Williams, Hamlet and Mestril assumed a position of trust and confidence.

88. Williams, Hamlet and Mestril specifically agreed with ACS to "devote full employment energies, abilities, and time to the performance of services" under their respective Agreements. **(Exhibits E, F and H, ¶ 8.)**

89. In their management capacities at ACS, Williams, Hamlet and Mestril were placed in positions of trust and confidence with regard to ACS property in their possession and have a fiduciary obligation not to use or disclose this property during their employment or upon termination of their employment.

90. As agents of ACS, Williams, Hamlet and Mestril have duties to ACS not to use or to disclose to third persons, on their own account or on account of others, trade secrets, or other similar confidential matters given to them only for ACS' use.

91. At all the times, the property held by Williams, Hamlet and Mestril rightfully belonged to ACS.

92. Williams, Hamlet and Mestril have breached their duties not to disclose or use the confidential information and trade secrets of ACS in competition with ACS.

93.     Williams, Hamlet and Mestril, working in concert with HCI, have been competing and continue to compete directly with ACS.

94.     Williams, Hamlet and Mestril, therefore, are in a position where they must inevitably breach their obligation of confidentiality and non-disclosure.

95.     Williams, Hamlet and Mestril will, unless restrained, continue to violate ACS' rights and continue to ignore their duties not to disclose or use proprietary information and trade secrets of ACS. Such use and disclosure are inevitable, as evidenced by their unlawful conduct.

96.     Williams, Hamlet and Mestril breached all of the aforementioned obligations. ACS has been severely damaged by the breach of their fiduciary duties, trust, and confidence obligations.

97.     ACS' damages have been proximately caused by the breach of the fiduciary duties of Williams, Hamlet and Mestril fiduciary duties to ACS.

98.     As a proximate result of the violation of the fiduciary duties of Williams, Hamlet and Mestril, ACS has been and will continue to be irreparably damaged and injured.

99.     ACS has no adequate remedy at law for the actions of Williams, Hamlet and Mestril because the damages ACS has suffered and will continue to suffer in connection with the violations by Williams, Hamlet and Mestril of their fiduciary duties, specifically the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of ACS' competitive edge, customer goodwill, and fair competition, are severe and are incapable of exact proof.

100.    Williams, Hamlet, and Mestril will, unless restrained preliminarily and permanently, continue to violate ACS' rights and to ignore their fiduciary duties to ACS by continuing to compete with ACS, to solicit its customers, to provide consulting services

similar to those of ACS using the talents of employees raided from ACS, and to misuse ACS' confidential information.

101. Accordingly, a preliminary and permanent injunction restraining and enjoining Williams, Hamlet and Mestril from continuing these unlawful actions is the only remedy that will afford ACS meaningful relief.

102. Due to the misuse and wrongful disclosure of ACS' confidential and proprietary information and trade secrets, as well as loss of its competitive edge, customer goodwill, and fair competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.

**COUNT VI**

**INTERFERENCE WITH CONTRACT-DEFENDANT HCI**

103. ACS realleges each and every allegation contained in paragraphs 1 through 102, inclusive, of this Complaint as though completely set forth herein.

104. Defendant HCI is knowingly interfering with ACS' Agreements with Williams, Hamlet and Mestril by committing the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another, here ACS.

105. Specifically, HCI is knowingly involving Williams, Hamlet and Mestril in the recruiting and healthcare information systems management consulting business, which is expressly prohibited by the respective Agreements of Williams, Hamlet and Mestril with ACS.

106. HCI's acts are intentional.

107. HCI's actions have invaded and are invading the contractual rights of ACS.

108. HCI's actions are taken with malice and are unjustified in law.

109.    As a proximate result of HCI's interference with ACS' contractual relations, ACS has been and will continue to be irreparably injured.

110.    ACS has no adequate remedy at law for HCI's actions because the damages ACS has suffered and will continue to suffer in connection with the divulgence of confidential information and trade secrets, as well as its loss of competitive edge, are severe and are incapable of exact proof.

111.    HCI, unless restrained preliminarily and permanently, will continue to violate ACS' rights by continuing to work with Williams, Hamlet and Mestril for the purpose and with the result of misuse and wrongful disclosure of confidential information and trade secrets, solicitation of ACS employees, prospective employees, clients and prospects, and performing prohibited consulting services in violation of the respective Agreements of Williams, Hamlet and Mestril.   Williams, Hamlet and Mestril remain in possession of a wealth of ACS' confidential and proprietary information  Their laptops contain all of the Kaiser Project information, staffing needs, staffing structure, skill sets, recruiting queue, and resumes, among other important ACS proprietary information and trade secrets. Both Hamlet and Mestril have wrongfully retained their Company laptop computers.   Williams has wrongfully retained his Company Blackberry, even in the face of ACS' demand that they return the laptops and Blackberry.   Accordingly, a preliminary and permanent injunction restraining and enjoining each Defendant from continuing their actions is the only remedy that will afford ACS meaningful relief.

112.    Due to the misuse and wrongful disclosure of its confidential information and trade secrets, the tortious interference with ACS' contracts and relationships, and its loss of competitive edge, customer goodwill, and employees, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorneys' fees.

## COUNT VII

### TORTIOUS INTERFERENCE WITH BUSINESS
### RELATIONSHIPS AND EXPECTANCIES
### DEFENDANTS WILLIAMS, HAMLET, MESTRIL AND HCI

113.    ACS realleges each and every allegation contained in paragraphs 1 through 112 as though completely set forth herein.

114.    ACS possesses, or possessed, a valid contractual relationship and/or business expectancy with Sutter Health and any other ACS client Williams, Hamlet, Mestril and HCI are soliciting for the provision of healthcare consulting services and staffing services.

115.    Williams, Hamlet, Mestril and HCI knew of ACS' business relationship and expectancy with Sutter Health, an important ACS client.   Williams, Hamlet and Mestril, through their employment with ACS and their access to the proprietary information and trade secrets of ACS, learned of the request for information ("RFI") from Sutter Health for consultants experienced in EPIC software. Hamlet had worked for Sutter Health. **(Exhibit O)** On information and belief, Williams and Hamlet, through HCI, introduced to Sutter candidates they had purloined from ACS.

116.    The actions of Williams, Hamlet, Mestril and HCI are improper and unjustified in law because, *inter alia*, they are continuing a course of conduct they began while Williams, Hamlet and Mestril are still bound by the non-competition, non-solicitation, and confidentiality provisions of their respective Agreements with ACS; and Williams, Hamlet, Mestril and HCI are using confidential information, trade secrets, and proprietary information of ACS, which they wrongfully misappropriated to further their tortious conduct.   The respective Agreements of Williams, Hamlet and Mestril prohibit each of these Defendants

from pursuing, during employment and for six (6) months thereafter, competitive opportunities they learned of in the course of their employment with ACS.

117. The improper and unjustified interference of Williams, Hamlet, Mestril and HCI in the contractual relationships and expectancies with Sutter Health, if unrestrained, will result in injury to ACS.

118. ACS has no adequate remedy at law for the actions of Williams, Hamlet, Mestril and HCI since the damages ACS has suffered and will continue to suffer in connection with the use of its property and conversion of its client relationships and carefully developed pre-qualified prospects, as well as the loss of its employees and prospective employees, and its customer goodwill, are incapable of exact proof.

119. Accordingly, a permanent injunction restraining and enjoining Williams, Hamlet, Mestril and HCI from interfering in any way, with any current contract, customer relationship or pre-qualified prospective client relationship or expectancies of ACS, including but not limited to Sutter Health, in addition to damages in excess of $75,000.00, will afford ACS meaningful relief.

## COUNT VIII

### VIOLATION OF MICHIGAN UNIFORM TRADE SECRETS ACT ("MUTSA") MCL § 445.1901 *et seq.*
### DEFENDANTS WILLIAMS, HAMLET, MESTRIL AND HCI

120. ACS realleges each and every allegation contained in Paragraphs 1 through 119, inclusive, of this Complaint as though completely set forth herein.

121. Williams, Hamlet and Mestril were placed in positions of trust and confidence with regard to ACS' confidential business information and properties in their possession, and were placed in control of key relationships that ACS had with its clients. Williams, Hamlet and Mestril were specifically experienced in ACS' EPIC implementation and staffing metrics

and will inevitably misuse ACS' confidential and proprietary information. Williams, Hamlet and Mestril have fiduciary obligations not to disclose this information and not to wrongfully use this information for their own competitive advantage and that of HCI.

122. ACS took reasonable security measures to protect its proprietary and confidential information. The company specifically required its employees to sign a confidentiality agreement as part of their employment agreements. Employees' access to ACS sensitive and proprietary information is password protected. Certain information is distributed on a "need to know" basis only. The physical premises of ACS are secured with physical access further restricted as well.

123. Williams, Hamlet, Mestril and HCI have in their possession proprietary information, trade secrets, and other valuable property of ACS. ACS' confidential and proprietary information and documents have been established at considerable time and expense to ACS and are not generally known.

124. ACS' proprietary and confidential information and trade secrets are of immense value to anyone operating in a similar business as ACS.

125. Over many years at a great cost, ACS created the confidential information and property that Williams, Hamlet, Mestril and HCI have in their possession.

126. Williams, Hamlet, and Mestril expressly admitted and agreed that the information is secret and valuable to ACS. (**Exhibits E, F and H, ¶ 11**)

127. ACS has requested the return of all of its information and/or property.

128. The use and disclosure by Williams, Hamlet, and Mestril of ACS' proprietary and confidential information are inevitable.

129. The continued possession and misuse of ACS' information and/or property by Williams, Hamlet, Mestril and HCI are unauthorized and unlawful.

31

130.    The possession and misuse of ACS' information and property have unfairly provided Williams, Hamlet, Mestril and HCI with immeasurably valuable materials.

131.    The possession and misuse of ACS' information and property by Williams, Hamlet, Mestril and HCI have resulted in an inequity. Williams, Hamlet, Mestril and HCI are benefiting unjustly from the time, money, and effort spent by ACS over a number of years. The possession and use by Williams, Hamlet, Mestril and HCI have allowed them to step into the shoes of ACS without having to spend the time and money to build the relationship and do the work performed by ACS in order to develop ACS' proprietary information and property.

132.    ACS has no adequate remedy at law for the actions of Williams, Hamlet, Mestril and HCI because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, the loss of its employees and prospective employees, customer goodwill, and fair competition, are severe and are incapable of exact proof.

133.    Williams, Hamlet, Mestril and HCI will, unless restrained preliminarily and permanently, continue to use and disclose ACS' proprietary and confidential information.

134.    Accordingly, a preliminary and permanent injunction, restraining and enjoining Williams, Hamlet, Mestril and HCI from continuing this unlawful action is the only remedy that will afford ACS meaningful relief.

135.    Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and fair competition, ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorney's fees.

## COUNT IX

### CIVIL CONSPIRACY
### DEFENDANTS WILLIAMS, HAMLET, MESTRIL AND HCI

136.    ACS realleges each and every allegation contained in Paragraphs 1 through 135, inclusive, of this Complaint, as though completely set forth herein.

137.    Williams, Hamlet, Mestril and HCI have been, and are, engaged in a concerted action to solicit, receive and use ACS' trade secrets, confidential and proprietary information.

138.    This concerted action is done to accomplish the unlawful purpose of misappropriating trade secrets and confidential and proprietary information, interfering with ACS' contractual and business relations, engaging in unfair competition with ACS, and breaching the fiduciary duties owed to ACS, as set forth above.

139.    ACS has no adequate remedy at law for the conspiracy of Williams, Hamlet, Mestril and HCI because the damages ACS has suffered and will continue to suffer in connection with the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, the loss of its employees and prospective employees, customer goodwill, and fair competition, are incapable of exact proof.

140.    Williams, Hamlet, Mestril and HCI will, unless restrained preliminarily and permanently, continue to conspire to use and disclose ACS' proprietary and confidential information.

141.    Accordingly, a permanent injunction, restraining and enjoining Williams, Hamlet, Mestril and HCI from continuing to conspire is the only remedy that will afford ACS meaningful relief.

142.    Due to the misuse and wrongful disclosure of confidential information and trade secrets, as well as loss of its competitive edge, customer goodwill, and fair competition,

ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs, and attorney's fees.

## COUNT X

## CONVERSION

143. ACS realleges each and every allegation contained in paragraphs 1 through 142 as though completely set forth herein.

144. In their Agreements, Williams, Hamlet and Mestril recognized that "all company resources of any kind and nature including but not limited to personnel, equipment and telephones; software; written materials, methods and procedures; client and prospect names, files and documentation are the sole property of the Company and shall not be used for personal or any other non-company reasons." **(Exhibits E, F and H)**

145. Williams, Hamlet and Mestril further agreed that upon termination, they would return to ACS any and all materials acquired during the period of their employment.

146. During the course of their employment Williams, Hamlet and Mestril were furnished with ACS property including but not limited to ACS-issued laptops, Blackberries, other electronic devices and other tangible ACS property.

147. Without permission from ACS, Williams, Hamlet and Mestril removed this property from ACS and have used it for their own benefit and for the benefit of HCI.

148. Williams, Hamlet and Mestril have failed and/or refused to return other ACS property including but not limited to ACS-issued laptops, Blackberries, other electronic devices and other tangible ACS property

149. The continued possession of ACS' property, by Williams, Hamlet and Mestril and/or HCI is unauthorized, improper and an unlawful use of ACS' property.

150. Due to Williams', Hamlet's and Mestril's use of and failure and/or refusal to return other ACS property including but not limited to ACS-issued laptops, Blackberries, other electronic devices and other tangible ACS property, as well as loss of ACS competitive edge, customer goodwill, and fair competition, Plaintiff ACS has been injured in an amount that exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.

## COUNT XI

### ATTORNEYS FEES AS AUTHORIZED UNDER
### THE MICHIGAN UNIFORM TRADE SECRETS ACT

151. ACS realleges each and every allegation contained in paragraphs 1 through 150 as though completely set forth herein.

152. By becoming involved with Williams, Hamlet, and Mestril, HCI has become apprised of the business and recruiting contacts with, and therefore directly competitive relationships with recruiting contacts and customers of ACS established before or during the time Williams, Hamlet and Mestril were employees of ACS.

153. ACS took reasonable security measures to protect its proprietary and confidential information. The company specifically required its employees to sign a confidentiality agreement as part of their employment agreements. Employees' access to ACS sensitive and proprietary information is password protected. Certain information is distributed on a "need to know" basis only. The physical premises of ACS are secured with physical access further restricted as well.

154. Williams, Hamlet, and Mestril inevitably will use ACS' proprietary information and relationships developed with its customers for the benefit of HCI.

155. Williams, Hamlet, and Mestril have, in fact, already used ACS' proprietary information and competitive business relationships for the benefit of HCI.

156. As agents of HCI, Williams, Hamlet, and Mestril continue to willfully and maliciously misappropriate ACS' proprietary information and competitive business relationships for the benefit of HCI.

157. By becoming involved with Williams, Hamlet, and Mestril, receiving trade secret information from them and with the knowledge that they will continue to use the proprietary information of ACS and competitive business relationships for the benefit of HCI, HCI is willfully and maliciously misappropriating trade secrets and proprietary information from ACS.

158. ACS has incurred, and will continue to incur attorneys' fees to enforce its non-competition, non-solicitation and non-disclosure Agreements with Williams, Hamlet, and Mestril in order to protect its proprietary information and trade secrets from willful and malicious misappropriation by Williams, Hamlet, and Mestril and HCI.

159. Accordingly, ACS must be awarded reasonable statutory attorneys' fees in addition to damages in excess of $75,000.00 and a permanent injunction.

## RELIEF

ACS does not seek any form of relief that would prevent Williams, Hamlet and Mestril from being employed. ACS seeks only that relief that will enforce its contractual and other rights, enforce its property rights, and prevent any use of such property, remedy the damages that ACS has incurred as a result of the unfair and unlawful competition of Williams, Hamlet, Mestril and HCI and that will prevent ACS from incurring any further such damages.

**WHEREFORE**, Plaintiff, ACS respectfully requests:

(a)   That this Court issue a Temporary Restraining Order and Preliminary and Permanent Injunction restraining and enjoining Defendants Williams, Hamlet, and Mestril, directly or indirectly:

   (i)   From engaging in any healthcare information systems consulting, recruiting or management consulting businesses for a period of six (6) months from the date of the Court's Order;

   (ii)   From commencing or continuing involvement with Defendant HCI, or with another competing entity, in the field of healthcare information systems consulting, recruiting or management consulting for a period of six (6) months from the date of the Court's Order;

   (iii)   From competing in any other way, directly or indirectly, with ACS in the field of healthcare information systems consulting, recruiting and management consulting business for a period of six (6) months from the date of this Court's Order;

   (iv)   From using or disclosing at any time in the future ACS' confidential business information, trade secrets, proprietary information or property;

   (v)   From deleting or destroying any of ACS' confidential business information, trade secrets, proprietary information or property; from taking any action to delete, destroy, damage or "wipe clean" any computer hard drive, including without limitation their ACS-issued laptops and Blackberrys, containing ACS' confidential information or evidence relevant to this case.

   (vi)   From interfering, in any way, with any current contract or prospective client relationship of ACS; and

   (vii)   From breaching any fiduciary obligation to ACS, including but not limited to, appropriating any business opportunity of ACS, engaging in deceptive acts or statements with regard to ACS' abilities, experiences, and personnel, and otherwise attempting to gain unfair advantage in any healthcare information systems consulting or management consulting business, and disclosing or using ACS' confidential or proprietary information.

(b)   That this Court issue a Temporary Restraining Order, Preliminary and Permanent Injunction restraining and enjoining Defendant HCI, directly or indirectly:

(i)    From employing or working directly or indirectly with Williams, Hamlet, and Mestril, in any healthcare information systems consulting, recruiting or  management consulting businesses for a period of six (6) months from the date of this Court's Order;

(ii)   From using or disclosing at any time in the future ACS' confidential business information, trade secrets, proprietary information or property;

(iii)  From deleting or destroying any of ACS' confidential business information, trade secrets, proprietary information or property; from taking any action to delete, destroy, damage or "wipe clean" any computer hard drive, including without limitation their ACS-issued laptops, containing ACS' confidential information or evidence relevant to this case.

(iv)   From interfering, in any way, with any current customer or prospective customer relationship of ACS; and

(v)    From engaging in deceptive acts with regard to ACS' abilities, experiences, and personnel to gain an unfair advantage in the healthcare information systems consulting or management consulting business.

(c)    That Defendants Williams, Hamlet, Mestril and HCI be ordered in the form of a mandatory preliminary injunction to, within seven (7) days of the date of this order, return all ACS property to ACS, including all laptops and Blackberries, all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, disks, notes, client files, client information, employment information, recruiting information, ACS employee skills information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect data, network diagrams, proposals, faxes, pricing, contracts awarded, technical specifications and related documents, marketing brochure, data network specifications, recommendations including but not limited to vendor recommendations, marketing database, costs, customer lists, customer information, strengths and weaknesses, prospect and client data, marketing plans, employee and prospective employee data, utilization, and bench information, employee profiles and skills data, alliance relationships, competitive bid information, client contact lists, sales leads, business plans, profit, margin, and forecasting information, strategic planning, project costs, and other data kept in any form or media whatsoever;

(d)    That after trial in this action, a permanent injunction be issued to the same effect as the preliminary injunction requested above; and

(e)   That ACS be granted as relief money damages, including exemplary damages, lost profits, all other appropriate damages, as well as all interest, costs, and disbursements of this action, including reasonable attorneys' fees and such other relief as this Court may deem just and proper.

Respectfully submitted,

**BUTZEL LONG**

By: _Elizabeth A. DMouchelle_

Carey A. DeWitt (P36718)
Elizabeth A. DuMouchelle (P45462)
Gregory N. Blase (P66079)
Suite 100, 150 West Jefferson
Detroit, Michigan 48226
(313) 225-7000
**Attorneys for Plaintiff**

Dated:  March 29, 2006

## VERIFICATION

The undersigned, being first duly sworn, deposes and says that she has read the foregoing Complaint and that the statements of fact contained therein are true based upon her knowledge and information.

ACS CONSULTANT COMPANY, INC. f/k/a
SUPERIOR CONSULTANT COMPANY, INC.

By: *Susan M. Synor*

Susan M. Synor

Its:    **Senior Vice President**
       **ACS Healthcare Solutions**

Subscribed and sworn to before me
this 28th day of March, 2006

*Mary Kathleen Ellison*

Notary Public

> MARY KATHLEEN ELLISON
> NOTARY PUBLIC-STATE OF MICHIGAN
> COUNTY OF OAKLAND
> My Commission Expires February 17, 2011
> Acting in the County of: Wayne

839393



# People Making Technology Work™

International Sites... 

| Business Process
  Outsourcing
| Information Technology
| Systems & Integration
| e-Solutions

Home | Service Offerings

**Service Offerings**

At ACS, we provide a full range of outsourcing services and solutions to businesses, government, and industry leaders, both large and small. When our clients choose ACS, they feel confident and secure that they'll receive the best people, the best tools, and the assurance that their ACS team will be there every step of the way ... until success is achieved.

ACS' capabilities and expertise span the areas of:

- Business Process Outsourcing (BPO)
- Information Technology Outsourcing (IT)
- Systems & Integration
- e-Solutions



We didn't invent technology. We just created a better way to make it work for our clients.

© Copyright 1994 - 2006 Affiliated Computer Services, Inc. All Rights Reserved.

People Making Technology Work™



International Sites...

| Applications Solutions
| Data Center
  Management
| Disaster Recovery
| End-User Computing
| Network Management
| Security Services
| Storage Solutions
| Technology Review,
  Assessment,
  and Planning
| Transition Services -
  Human Resources
| Contact Us

Home | Service Offerings | IT

**Transition Services - Human Resources**

Making the decision to outsource IT often can be easy from a financial perspective, but what abou and operational impact of this change?

Deliverables from IT depend on both facilities and the people who design, assemble, operate, and Simply shipping data tapes to an outside vendor dramatically devalues human capital and equity-involving significant corporate investment. Such an approach also is generally inconsistent with m organizations' goals for human resources.

We provide the best economic and human resources aspects of IT by transitioning your employee professional home at ACS, with a more specifically defined career path. Those who possess speci knowledge of client IT operations continue to support those programs, while cross-training other on their unique skills to provide greater depth of support. Employees with more generalized skill continue to support their former employer, deliver services to other ACS clients, or a combinatior many cases, employees move from being part of a technology cost center to being a revenue pro company.

ACS' approach to transitioning employees begins during the important due diligence period, when we identify all employees who work within the scope of the proposed outsourcing engagement. When the timing is appropriate, we conduct individual, small group, and large-scale meetings to present ACS and the range of professional opportunities available to transitioning employees. These settings also provide opportunities for ACS personnel—many of whom have, themselves, been transitioned—to answer questions about our company and the transition process.



The best measure of success in our transition methodology is the number of employees who transition to and stay with ACS. Our retention rate for transitioned employees after one year of employment at ACS exceeds 90 percent.

© Copyright 1994 - 2006 Affiliated Computer Services, Inc. All Rights Reserved.

Home  Site Map  Privacy  Terms of Use  Contact U

# People Making Technology Work™



International Sites...

| Business Process
  Outsourcing
| Information Technology
| Systems & Integration
| e-Solutions

Home | Service Offerings | Systems & Integration

**Systems & Integration Services**

Experienced people. Proper tools. Innovative solutions. These are the backbone of ACS' systems and integration services.

This expanding service line supports a growing number of clients with a full range of information technology professionals, from programmers to full development teams, addressing applications and systems design, development, and maintenance support needs.

Our systems and integration services span the areas of:

- Applications Support
- Consulting
- Systems Design & Development
- Systems Integration
- Training

We provide the necessary talent, expertise, and resources to make our clients' information systems and technology work. We do whatever it takes to help our clients achieve their goals.

Each member of the ACS team possesses the ingenuity, drive, and talent to make a positive difference to the client's business. No matter what the need, or how specific, we can fill it.

© Copyright 1994 - 2006 Affiliated Computer Services, Inc. All Rights Reserved.

About ACS    Service Offerings    Industry Groups    Investor Relations    Press Releases    Career Opportunities

Home   Site Map   Privacy   Terms of Use   Contact U

# People Making Technology Work™



| International Sites... |

| **Applications Solutions**

| **Data Center
Management**

| **Disaster Recovery**

| **End-User Computing**

| **Network Management**

| **Security Services**

| **Storage Solutions**

| **Technology Review,
Assessment,
and Planning**

| **Transition Services –
Human Resources**

| **Contact Us**

Home | Service Offerings | IT

### Applications Solutions

Data becomes powerful information only when combined with task-specific software tools.

ACS provides application services that match a specific client's business requirements with the m
software solutions. We identify desired deliverables, review available tools, and determine the mo
approach to fulfilling business information needs.

The packages we apply span the full spectrum, from common off-the-shelf applications to highly
systems developed specifically for individual clients.

Additionally, ACS has a specialized Application Management Services unit within our larger applic
that provides solutions to clients for whom highly configured applications—such as Oracle, SAP, P
Edwards, and Lawson enterprise applications, as well as Microsoft Exchange, Sun ONE, Lotus Dor
Message Control messaging solutions—are most appropriate.

After the solution has been identified, ACS implements a
well-defined process to migrate business activities from
previous systems or approaches to the new
environment, with an emphasis on business continuity
throughout the conversion.

Once implemented, the ACS team works behind the
scenes to ensure that the applications are maintained
and, as appropriate, enhanced and upgraded. Our
expertise in applications development and management
underscores our commitment to operational excellence
for our clients.



© Copyright 1994 - 2006 Affiliated Computer Services, Inc. All Rights Reserved.

B

MICHIGAN DEPARTMENT OF CONSUMER & INDUSTRY SERVICES, BUREAU OF COMME

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

**CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE ISSUING GOVERNMENT AGENCY**

MICHIGAN DEPARTMENT OF CONSUMER & INDUSTRY SERVICES, BUREAU OF COMMERCIAL
SERVICES, CORPORATION DIVISION

**Company Name:** ACS CONSULTANT COMPANY, INC.

**Type:** DOMESTIC PROFIT CORPORATION

**Status:** ACTIVE

**Filing Date:** 10/1/1984

**State or Country of Incorporation:** MICHIGAN

**Purpose:** ALL PURPOSE CLAUSE

**Registered Agent:** CSC-LAWYERS INCORPORATING SERVICE (COMPANY)

**Registered Office:**
  601 ABBOTT RD
  EAST LANSING, MI 48823

**Other Name Information:**
  SUPERIOR CONSULTANT COMPANY
  Type: ASSUMED
  Creation Date: 2/11/2005
  Expiration Date: 12/31/2010


  ACS HEALTHCARE SOLUTIONS
  Type: ASSUMED
  Creation Date: 2/11/2005
  Expiration Date: 12/31/2010


  HIT RESOURCES
  Type: ASSUMED
  Creation Date: 4/17/2003
  Expiration Date: 12/31/2008

**Filing Number:** 287806

**Acts:** 284-1972 BUSINESS CORPORATION ACT

**Annual Report:**
  Report Date: 2005
  Roll: 5927
  Frame: 933

MICHIGAN DEPARTMENT OF CONSUMER & INDUSTRY SERVICES, BUREAU OF COMME

**Stock Information:**
Shares Issued: 5,000,000
Change in Stock: YES

**History:**
File Date: 3/7/2005
Comments: PREV RA: THE CORPORATION COMPANY
Transaction: CHANGE OF AGENT AND/OR OFFICE

File Date: 3/7/2005
Comments: PREV RO: 30600 TELEGRAPH RD., STE 3275 BINGHAM FARMS MI 48025
Transaction: CHANGE OF AGENT AND/OR OFFICE

File Date: 1/28/2005
Comments: SUPERIOR CONSULTANT COMPANY, INC.
Transaction: NAME CHANGES

File Date: 10/10/1996
Comments: MERGER FILED: SURVIVOR: 287-806
Transaction: MERGERS

File Date: 5/15/1990
Comments: 1990 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 3407
Frame: 1736

File Date: 5/15/1989
Comments: 1989 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 3278
Frame: 1461

File Date: 5/15/1988
Comments: 1988 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 3131
Frame: 2924

File Date: 6/30/1987

Page 3

MICHIGAN DEPARTMENT OF CONSUMER & INDUSTRY SERVICES, BUREAU OF COMME

Comments: PREV STK:50,000 COM (1) ART III CHGD
Transaction: STOCK HISTORY
Roll: 1918


File Date: 6/30/1987
Comments: SUPERIOR CONSULTANT COMPANY
Transaction: NAME CHANGES
Roll: 1918


File Date: 5/15/1987
Comments: 1987 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 3137
Frame: 0805


File Date: 5/15/1986
Comments: 1986 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 2901
Frame: 2804


File Date: 5/15/1985
Comments: 1985 MAR FILED
Transaction: ANNUAL REPORT FILED
Roll: 2714
Frame: 2596

