UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACS CONSULTANT COMPANY, INC. f/k/a
SUPERIOR CONSULTANT COMPANY, INC., a
Michigan Corporation,

      Plaintiff,

v.

WILLIE WILLIAMS, RYLAND HAMLET, and
RAUL MESTRIL, Individuals, and HEALTHCARE
INFORMATICS TECHNICAL STAFFING, LLC, a
California Limited Liability Company,

      Defendants.

Case No. 06-11301
Honorable Lawrence P. Zatkoff

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
Federal Building, in the City of Port Huron,
State of Michigan, on the 6th day of April, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Docket #2) against all of the Defendants. On Thursday, March 30, 2006, the Court granted a temporary restraining order ("TRO") that, in essence, enjoined all of the Defendants from violating the terms of the Employment Agreements signed by the three individual defendants, Willie Williams ("Williams"), Ryland Hamlet ("Hamlet") and Raul Mestril ("Mestril"). The TRO also scheduled a preliminary injunction hearing for Tuesday, April 4, 2006. The

preliminary injunction hearing was held on April 4, 2006, and was attended by Plaintiff and Mestril, as well as their respective attorneys. To date, the Court has not been contacted by Williams, Hamlet or the corporate defendant, Healthcare Informatics Staffing, LLC ("HCI").

At the hearing, Plaintiff called three witnesses: (1) Susan Synor, Senior Vice President of the Plaintiff, whose duties include Human Resources and Recruiting responsibilities; (2) Lauren Goldberg, an employee of Plaintiff; and (3) Whitney Bolyard, an employee of Plaintiff. Counsel for Mestril cross-examined each of these witnesses. In addition, Plaintiff introduced three exhibits (which were received for the purpose of the hearing) and presented the Court with affidavits for two additional employees of the Plaintiff, Dr. Betty Jo Bomentre and Suzanne Henry.

At the conclusion of the hearing, Plaintiff and Mestril entered into a verbal agreement (which is to be supplemented by a stipulated written agreement) regarding Mestril's ongoing conduct. Accordingly, the Court does not make any findings with respect to Mestril in this Opinion.

## II. BACKGROUND

### A. *Generally*

Plaintiff provides information technology and management consultant services, principally to health care providers. It has employees residing in at least 48 states and has provided services to clients in all 50 states, as well as internationally. Plaintiff hired Hamlet as a Senior Management Consultant in November 2004, Williams as an Executive Director in July 2005 (his title was later changed to Partner) and Mestril as a Recruiting Manager in October 2005. All three individual defendants worked onsite for one of Plaintiff's clients, Kaiser-Permanente ("Kaiser"), in the Los Angeles, California area, and all three had offices within close proximity to each other on the 5th

Floor of the Parsons West building in Pasadena, California.  Goldberg and Bolyard also worked in these offices.

Each individual defendant executed an Employment Agreement with Plaintiff (or Superior Consultant, Inc.) and each Employment Agreement included the following provisions (except that Hamlet's agreement did not include the language of ¶9©) below):

> 8. <u>Other Gainful Employment</u>: The Employee shall devote full employment energies, abilities and time to the performance of services hereunder.  The Employee is prohibited from performing services similar to those offered by ACS on behalf of any other company, organization, individual or other legal entity. The Employee is also prohibited from soliciting or negotiating to perform services similar to those offered by ACS on behalf of any other company, organization, individual or other legal entity.  Further, the Employee must seek written approval of the Company prior to engaging in any employment of any nature similar to the Company's services or otherwise.
>
> 9. <u>Non-competition</u>:
>
> > (a) <u>No Recruitment of Company Personnel</u>: In consideration of employment with the Company, the employee is prohibited, during employment and for a period of two (2) years following termination of employment for any reason, from recruiting, on behalf of him or herself, or on behalf of any third party, any employees of the company either directly or indirectly, specifically including, without limitation, identification to a third party (including, without limitation, recruiting agencies, employers and prospective employers) employees of the Company or any of its subsidiaries or affiliates.
> >
> > (b) <u>Restrictions on Solicitation of Company Clients</u>: In consideration of employment with the Company, the employee is prohibited, during employment and for a period of six (6) months following termination of employment for any reason, from (1) soliciting business and/or performing services via direct employment or through a party other than the Company, its subsidiaries or affiliates, for clients of the Company or prospective clients of the Company for whom the employee, during the twelve (12) months period immediately preceding termination of employment, was directly involved in the delivery of products or performance of services, or was personally involved in a relationship management role or in sales or marketing

    efforts; (2) soliciting, individually or on behalf of any person or entity, to perform, or performing services for, or referring to or advising any entity about, an opportunity to perform services for any client or prospective client of ACS where employee learned of the opportunity for that work while employee was employed by ACS.

  (c) <u>No Competitive Business Involvement</u>: In consideration of employment with the Company, the Employee is prohibited, during employment and for a period of six (6) months following termination of employment from engaging in healthcare information systems consulting, management consulting or other businesses competitive with the Company.

  (d) The non-competition provisions contained herein shall survive termination of employment.

10. <u>Proprietary Rights</u>: The Employee agrees that all work and creation of work products associated with this Employment Agreement are deemed work for hire for the company. In consideration of employment with the Company the Employee assigns and transfers to the Company all property rights of any kind and nature (including without limitation royalties, other income and property rights) in discoveries, inventions, patentable material, copyrightable materials (including any writing, book, article, computer program, work method, film, recording or graphic production) and other work products. The Employee further agrees the Employee shall cause to be furnished to the Company such instruments, instructions and documentation as the Company may reasonably require to insure that the aforesaid rights shall belong to the Company. The Employee shall, upon request by the Company, return or destroy all proprietary information as so directed by the Company.

11. <u>Confidential Information</u>: The Employee recognizes that in the course of performance of work for the Company the Employee will obtain access to materials and information of the Company, its subsidiaries and affiliates that constitute trade secrets and proprietary information of the Company, its subsidiaries and affiliates including, without limitation, descriptions of the Company's, its subsidiaries' and affiliates' products and services, planned products and services, business and marketing/sales plans, mergers and acquisition targets, employee compensation plans, employee medical information, the identities of suppliers, customers and prospective customers, identities of employees and prospective employees, prices and pricing policies in whatever form received by employee, including without limitation, written, voice, electronic or magnetic media or graphic display. The Employee shall not utilize any such information for any purpose other than the performance of this Employment Agreement and shall not disclose

        any such information to any third party. The Employee shall, upon request by the Company, return or destroy, as directed by the Company, any media in which such information is recorded.

        The Employee shall also observe any restrictions with respect to the use and disclosure of the confidential information of the Company's clients that are specified in the Company's service agreements with the clients, or that are reasonably required by the clients.

        The Employee understands that his/her obligation of non-disclosure shall survive termination of employment for any reason whatsoever.

14. <u>Termination of Employment</u>: In the event employment with the Company is terminated by either the Employee or the Company, the Employee agrees to return all materials acquired during the term of employment with the Company. Specifically, this is to include without limitation, computer disks, computers, work papers, manuals, training manuals, notes, articles, phone lists, correspondence, proposals, addresses, reports, phone cards, office keys and any and all material related to employment with the Company.

18. <u>Choice of Law and Forum</u>: This Employment Agreement will be governed by and interpreted in accordance with the laws of the State of Michigan.

        Any action arising out of this Agreement or the termination of this Agreement, or the performance of services under this agreement, or the relationship of the parties established herein, shall be brought only in the Oakland County Circuit Court, Michigan, or United States District Court for the Eastern District of Michigan, Southern Division, at Detroit, Michigan, and Employee hereby consents to and submits to the jurisdiction of either of such courts for such purpose.

On November 7, 2005, Plaintiff entered into a Subcontractor Master Agreement (the ACS/HCI Contract") with HCI, a technical staffing company based in California that allegedly acts as a recruiting agency for healthcare facilities and consultants such as Plaintiff. Noelle Dayola executed the ACS/HCI Contract on behalf of HCI. Noelle Dayola allegedly is the wife of Hamlet and Hamlet is the principal of HCI. Neither of these two things were disclosed to Plaintiff at the time the ACS/HCI Contract was executed. Plaintiff never issued any work orders to HCI, though HCI held itself out as a preferred vendor of the Plaintiff.

On March 8, 2006, after an investigation of alleged misconduct and wrongful activities by Williams, Mestril and Hamlet, Plaintiff executives met with Williams and terminated his employment. He was asked to return Company materials, but he failed to do so (a company issued Blackberry was not returned, among other things). The same day, Plaintiff executives met with Mestril and encountered the same difficulties in getting Company materials returned. Mestril took the Plaintiff executives to his apartment to get the Company-issued laptop but claimed it was gone from where he had left it. The Plaintiff executives were unable to terminate Hamlet in person because he left the offices before they could do so. He was terminated via express mail and email over the next two days.

On March 29, 2006, Plaintiff filed an 11 count Verified Complaint for Injunctive and Other Relief and a Motion for Temporary Restraining Order and Preliminary Injunction. On March 30, 2006, the Court issued a Temporary Restraining Order and set a preliminary injunction hearing for April 4, 2006, at 10:00 a.m.

### B.   *Preliminary Injunction Hearing*

In its Motion, Plaintiff alleged that during their employment by Plaintiff, the individual defendants conspired to present certain candidates of ACS as recruits of HCI by "purloining" the resumes of potential ACS candidates. Plaintiff also alleges that Hamlet approached employees for the purpose of having such employees recruit experienced ACS employees to work for Sutter Health. Sutter Health is (a) a large healthcare system with facilities all over California, (b) a company for which Hamlet had once worked, and (c) a client of ACS. At the preliminary injunction hearing, Goldberg, Bolyard and Synor testified that Mestril, Williams and Hamlet took steps in

furtherance of such acts or failed to deny their affiliation with such plans.

Goldberg testified that Hamlet first proposed an opportunity at Sutter Health for her and 7-10 other ACS employees in early January 2006. At that time, Hamlet did not tell her that she would have to leave her employment at ACS to pursue that opportunity. Goldberg testified that she then provided Hamlet with resumes of three non-ACS employees (including Joseph Norgren) that would be qualified for the project. Later that month, Goldberg spoke to Hamlet to obtain an update regarding the Sutter Health project. As Mestril was standing next to Hamlet when Goldberg spoke, she asked Hamlet if she could speak freely in front of Mestril. Goldberg testified that Hamlet said she could because Mestril knew about the Sutter plan and "the Agency." According to Goldberg, Mestril nodded his head in agreement when Hamlet said Mestril knew. Goldberg had previously learned that Hamlet, Williams and Mestril funneled resumes provided to ACS to "the Agency."

Goldberg met with Hamlet again later in January and learned for the first time that she would have to terminate her employment with ACS in order to take the Sutter Health opportunity. Goldberg then testified that Hamlet told her that if she brought in a number of people to the Sutter Health project, she would get bonuses, though she would have to contribute $10,000 to begin working for the Agency. Finally, Goldberg testified that when she received a roster of her new ACS team in February, Joseph Norgren showed up on her roster even though she hadn't been told that he had been hired. She testified that the absence of notice was unusual because Plaintiff normally notified her when someone she referred was hired. Goldberg then learned that Joseph Norgren showed up as an HCI referral, even though she had referred him in to ACS/Hamlet. About that time, Hamlet told her she was getting a $1,000 bonus for Joseph Norgren's hire. Goldberg thought that odd because normally ACS didn't pay bonuses for referrals for 90 days or so. Shortly thereafter,

7

Goldberg contacted Synor about these matters.

Bolyard testified that on March 6, 2006, she spoke to Williams and Hamlet outside of the Plaintiff's offices in Pasadena. Williams conveyed to her that he would be leaving the Kaiser project and ACS soon. He said he would be going "up north" to something really big and wanted 7-10 of the best qualified EPIC people from the Kaiser project. Hamlet was standing there and nodded in agreement. Bolyard agreed to meet with Williams and Hamlet on March 8, 2006 to discuss this further. On the evening of March 6, 2006, Bolyard had dinner with Bill Ryan, a subcontractor on the Kaiser project. Bolyard testified that Bill Ryan also had been approached by Williams, Hamlet and Mestril to go "up north," which meant the Sutter Health project. Bolyard testified that she became suspicious of Williams' statements and contacted Synor with her concerns.

Synor testified that upon learning of alleged wrongful activity by Hamlet, Williams and Mestril, she conducted an investigation of their activities beginning in January 2006. Ultimately, she concluded that the individual defendants had breached their Employment Agreements and misappropriated Plaintiff's proprietary information and trade secrets. Synor testified that she concluded that Hamlet, Williams and Mestril had directed candidate resumes and solicited both clients and employees to HCI in violation of their Employment Agreements. Some of the information that supported her conclusions came from the information about which Goldberg and Bolyard testified at the hearing.

Synor also testified regarding the steps that Plaintiff takes to protect their confidential information, including the use of confidentiality/employment agreements for employees and clients, password protections and security protections for their servers, firewalls, restricted access to information on a need to know basis and passcards required for access to Plaintiff premises. Synor

further testified that there would be harm to Plaintiff if the Defendants continued to engage in their current activities and that the harm could not be repaired with money damages. Synor stated that such harm was irreparable because the individual defendants have and will continue to use confidential information, including client lists, employee lists, profit margins and recruiting strategies, in order to undercut Plaintiff in the marketplace. Synor also stated that the activities of defendants could cause broken relationships with longstanding clients and such injuries have already begun with respect to Sutter Health and Kaiser because of the disruption of on-site personnel and the ability to staff projects.

Lastly, Synor stated that she recently learned that Hamlet had begun working for Sutter Health on March 24, 2006. Synor expressed concern that Hamlet was violating the non-competition provisions of his Employment Agreement in ¶¶9(a) and 9(b) because he would be using information he learned while working for Plaintiff. She also claimed that Hamlet would be working for a client of Plaintiff, in violation of ¶9(b) of his Employment Agreement. Plaintiff therefore requested that the injunctive relief be modified to prohibit Hamlet from violating those provisions, including working for clients such as Sutter Health.

### III.  STANDARD OF REVIEW

A court is to consider the following four factors in determining whether a plaintiff is entitled to preliminary injunctive relief:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

    (3)    whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

    (4)    whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

## IV.  ANALYSIS

### A.  *Likelihood of Success on the Merits*

As Plaintiff notes, the courts of the Eastern District of Michigan have upheld as reasonable similar ACS agreements in the past. *See e.g., Superior v. Bailey*, 2000 U.S. Dist. LEXIS 13051 (E.D. Mich., August 22, 2000); *Superior v. Walling*, 851 F.Supp. 839 (E.D. Mich. 1994). Moreover, reasonable covenants not to compete against (former) employers are regularly recognized in Michigan. *See e.g., Rehmann, Robson & Co. v. McMahan*, 187 Mich.App. 36, 46 (1991). A non-compete is enforceable as long as (1) it is reasonably drawn as to its duration, geographical scope and line of business, and (2) it protects the legitimate business interests of the party seeking its enforcement. *Lowry Computer Prod., Inc. v. Head*, 984 F.Supp. 1111, 1116 (E.D. Mich. 1997).

The restriction of former employees from soliciting company employees and clients is a

legitimate business interest. So is protecting the company's confidential and proprietary information, including client lists and employee candidates. In fact, Michigan law has long recognized the importance of protecting trade secrets. *See* MCL 445.1901 *et seq.* (the Michigan Uniform Trade Secrets Act or "MUTSA"); *Albion v. Kuberski*, 421 Mich. 170, 181 (1984) (employee "would be prohibited by the common law from disclosing trade secrets"). A trade secret merits protection if (1) it derives independent economic value from not being generally known; and (2) the employer takes reasonable steps to protect the confidentiality of the information. MCL 445.1901; *Merrill Lynch, Inc. V. Ran*, 67 F.Supp. 764, 775 (E.D. Mich. 1999) (holding that the employer's customer list was entitled to trade secret status even if the restrictive covenant was unenforceable).

Like the other courts in this District, this Court finds that the terms of the individual defendants' Employment Agreements are reasonable. The Employment Agreement of Williams prohibits competition with Plaintiff while employed and for 6 months thereafter. Although Williams' Employment Agreement prohibits competition throughout the United States, such limitations regularly have been recognized as reasonable for a company providing services throughout the country. *See Lowry*, 984 F.Supp. at 1116 (unlimited geographical scope is reasonable if plaintiff's business is sufficiently national and international in scope) Here, Plaintiff has clients in 48 states and has serviced clients in all 50 states. This is particularly true when the scope of the restriction is limited to the type of work the employees provided for the former employer, in this case "healthcare information systems consulting, management consulting or other business competitive with the Company."

In addition, evidence has been proffered that Williams and Hamlet have violated MUTSA

by absconding with client and employee information and would continue to violate the terms of the Employment Agreements, as it appears they intended to use this information at clients/competitors even before they were terminated. Finally, if Hamlet has gone or is planning to work for Sutter Health (or any other ACS client), he is/would be in violation of ¶9(b) of his Employment Agreement. The Court also notes that Williams and Hamlet have failed, to date, to return property of the Plaintiff's, in contravention of requests by the Plaintiff and the terms of the Employment Agreements.

For these reasons, the Court finds that Plaintiff has demonstrated that there is a substantial likelihood that Plaintiff will succeed on the merits.

### B.     *Irreparable Injury*

Plaintiff asserts that Williams and Hamlet have already disclosed Plaintiff's trade secrets and other confidential information to HCI, and that unless they are enjoined from doing so, will continue to use the knowledge that they obtained from Plaintiff for the benefit of a competitor (HCI). Courts regularly have concluded that there is no adequate remedy at law where trade secrets and confidential information are absconded because the injuries a former employer suffers in connection with the loss of its competitive edge are indefinite and speculative. *See Chem-Trend*, 780 F.Supp. at 462 ("it would not be possible to measure plaintiff's actual loss of customers and goodwill"); *Superior v. Walling*, 851 F.Supp. at 847; *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (noting that damages are often irreparable because they are difficult to calculate).

The Court finds that the Plaintiff has submitted sufficient evidence that the individual defendants have provided and will continue to provide third parties (including HCI) with trade

secrets and confidential information of the Plaintiff. Accordingly, based on the established law in this Circuit, the Court believes that Plaintiff will suffer irreparable injury if injunctive relief is not granted.

### C.     *Substantial Harm to Others*

Plaintiff asserts that the injunction requested does nothing more than prohibit defendants from engaging in actions that are impermissible pursuant to their Employment Agreements, which the defendants freely entered into. *See e.g., UAW Local 6000 v. State*, 194 Mich.App. 489, 497-98 (1992), *appeal denied*, 440 Mich. 858 (1992) (upholding injunction, which among other things, prohibited implementation of downsizing plan and layoffs). The Court agrees that the injunctions sought here do not impose substantial harm on the individual defendants because the injunctions sought merely track the restrictive language of the Employment Agreements. Moreover, as each of the individual defendants voluntarily entered into his Employment Agreement and agreed to the limitations that Plaintiff now seeks to enforce, they cannot assert that, even if there is any harm, such harm is being imposed upon them unwillingly.

As to the injunction sought against HCI, the Court finds that HCI will not be subject to any significant harm either. The harm caused by being unable to hire or use ACS-related information supplied by Williams and Hamlet is not significant because they can't work for HCI based on their Employment Agreements. Accordingly, the Court concludes that this factor weighs in favor of the Plaintiff vis a vis the individual defendants, as well as in favor of the Plaintiff as against HCI.

### D.     *Public Interest*

The enforcement of non-compete agreements is in the public interest. *Walling*, 851 F.Supp.

at 848. Michigan law provides that the public interest is promoted in protecting confidential information and enforcing valid employment agreements. *See* M.C.L.A. 445.774a. One object of a preliminary injunction is to preserve the status quo. *Detroit v. Salaried Phys., UAW,* 165 Mich.App.142, 151 (1987). Plaintiff asserts that the status quo to be preserved in this case is the relationships that existed before the individual defendants violated their Employment Agreements and the misappropriation of Plaintiff's trade secrets. The Court agrees.

For the foregoing reasons, the Court finds that the public interest favors the enforcement of the Employment Agreements and the imposition of injunctive relief against the Williams and Hamlet (and against HCI to the extent consistent with such injunctive relief against the individual defendants).

**E.     Conclusion**

Based on weighing the four factors set forth in *Sandison*, the Court finds that all four factors weigh in favor of the Plaintiff's request for a preliminary injunction.

**V. CONCLUSION**

Accordingly, and for the reasons stated above, the Court grants Plaintiff's motion for preliminary injunction against Williams, Hamlet and HCI, and hereby ORDERS that:

1.  Williams and Hamlet shall be and are hereby enjoined, directly or indirectly:

    (i)     From using or disclosing at any time in the future ACS' confidential business information, trade secrets, proprietary information or property;

    (ii)    From deleting or destroying any of ACS' confidential business information, trade secrets, proprietary information or property; from taking any action to delete, destroy, damage or "wipe clean" any computer hard drive, including without

        limitation their ACS-issued laptops and Blackberrys, containing ACS' confidential information or evidence relevant to this case.

   (iii)    From interfering, in any way, with any current contract or prospective client relationship of ACS; and

   (iv)    From breaching any fiduciary obligation to ACS, including but not limited to, appropriating any business opportunity of ACS, engaging in deceptive acts or statements with regard to ACS' abilities, experiences, and personnel, and otherwise attempting to gain unfair advantage in any healthcare information systems consulting or management consulting business, and disclosing or using ACS' confidential or proprietary information.

2. Williams is and shall be enjoined, directly or indirectly:

   (i)    From engaging in any healthcare information systems consulting, recruiting or management consulting businesses for a period of six (6) months from March 30, 2006;

   (ii)    From commencing or continuing involvement with Defendant HCI, or with another competing entity, in the field of healthcare information systems consulting, recruiting or management consulting for a period of six (6) months from March 30, 2006; and

   (iii)    From competing in any other way, directly or indirectly, with ACS in the field of healthcare information systems consulting, recruiting and management consulting business for a period of six (6) months from March 30, 2006;

3. Hamlet is and shall be enjoined, directly or indirectly:

   (i)    From soliciting business and/or performing services via direct employment or through a party other than Plaintiff, its subsidiaries or affiliates, for clients of Plaintiff or prospective clients of the Company for whom he was directly involved in the delivery of products or performance of services, or was personally involved in a relationship management role or in sales or marketing efforts on behalf of Plaintiff during the 12 month period immediately preceding his termination; and

   (ii)    From soliciting, individually or on behalf of any person or entity, to perform, or performing services for, or referring to or advising any entity about, an opportunity to perform services for any client or prospective client of Plaintiff where he learned of the opportunity for that work while employed by Plaintiff;

4. HCI shall be and is enjoined, directly or indirectly:

   (i)    From employing or working directly or indirectly with Williams or Hamlet in any healthcare information systems consulting, recruiting or management consulting businesses for a period of six (6) months from the date of this Court's Order;

    (ii)      From using or disclosing at any time in the future ACS' confidential business information, trade secrets, proprietary information or property;

    (iii)     From deleting or destroying any of ACS' confidential business information, trade secrets, proprietary information or property; from taking any action to delete, destroy, damage or "wipe clean" any computer hard drive, including without limitation their ACS-issued laptops, containing ACS' confidential information or evidence relevant to this case.

    (iv)     From interfering, in any way, with any current customer or prospective customer relationship of ACS; and

    (v)      From engaging in deceptive acts with regard to ACS' abilities, experiences, and personnel to gain an unfair advantage in the healthcare information systems consulting or management consulting business.

5. Williams, Hamlet and HCI shall preserve all evidence, including hard copies, electronic, computer or any other format, which in any way relates to the claims made in this case;

6. This Opinion and Order does not affect in any manner whatsoever the obligation of Williams, Hamlet and HCI to comply with Paragraph 4 of the Temporary Restraining Order issued by the Court on March 30, 2006, which paragraph provided that:

> That Defendants Williams, Hamlet, Mestril and HCI are ordered in the form of a mandatory preliminary injunction to, within seven (7) days of the date of this order, return all ACS property to ACS, including all laptops and Blackberries, all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, disks, notes, client files, client information, employment information, recruiting information, ACS employee skills information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect data, network diagrams, proposals, faxes, pricing, contracts awarded, technical specifications and related documents, marketing brochure, data network specifications, recommendations including but not limited to vendor recommendations, marketing database, costs, customer lists, customer information, strengths and weaknesses, prospect and client data, marketing plans, employee and prospective employee data, utilization and bench information, employee profiles and skills data, alliance relationships, competitive bid information, client contact lists, sales leads, business plans, profit, margin, and forecasting information, strategic planning, project costs, and other data kept in any form or media whatsoever;

7. This Order shall remain in effect until further order of the Court.

    **IT IS SO ORDERED.**

s/Lawrence P. Zatkoff

**LAWRENCE P. ZATKOFF**

**UNITED STATES DISTRICT JUDGE**

**Dated: April 6, 2006**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on April 6, 2006.

s/Marie E. Verlinde

**Case Manager**

**(810) 984-3290**